## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JASON B. KELLOM,**

      **Petitioner,**

**vs.**

                                         **CASE NO. 4:09cv449-SPM/WCS**

**KENNETH S. TUCKER, Secretary,**
**Florida Department of Corrections,[1]**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This is an amended petition for writ of habeas corpus filed by Jason B. Kellom

pursuant to 28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his convictions after a jury

trial for armed carjacking (count III), armed carjacking with a firearm (count IV),

_____

    [1] On August 24, 2011, Kenneth S. Tucker succeeded Edwin G. Buss as the
Secretary of the Florida Department of Corrections, and is automatically substituted as
Respondent.  Fed.R.Civ.P. 25(d).

kidnapping to facilitate a felony (count V), and felony fleeing and eluding (count VI),

case number 2003-CF-3248, in the Circuit Court of the Second Judicial Circuit, in and

for Leon County, Florida. *Id.*

Respondent filed an answer, and exhibits in paper form. Doc. 15. References

herein to those exhibits. Petitioner filed a traverse. Doc. 17.

Respondent agrees that the petition was timely filed. Doc. 15, pp. 8-9.

Respondent argues that administrative remedies were not exhausted as to

ground five, but does not make a specific failure-to-exhaust arguments as to any other

ground. Respondent has also presented argument on the merits of each ground, but

expressly denied waiver of the failure-to-exhaust defense. It is often easier for this court

to reach the merits of all claims to deny them, as permitted by 28 U.S.C. § 2254(b)(2),

and I recommend that the court follow that procedure here.

**Summary of the trial evidence from the initial brief on appeal, Ex. H**

This case involves two robberies committed in the early morning of September

17, 2003, over a period of about 30 minutes. Daniel Lawrence, a pizza delivery worker,

was robbed of his pizza cash at gunpoint – a black revolver – by a black male in a

parking lot of a nearby apartment complex. The black male who committed this offense

got into the front passenger seat of a black sport utility vehicle and the vehicle drove

away. Obviously the robber was not the driver. The Tallahassee Police Department

immediately began an investigation into that robbery.

Shortly thereafter, Florida State University police officers were conducting an

investigation into the very recent armed robbery of Scott Rasku on campus. Rasku had

been walking from a parking lot to his dormitory when a black SUV on Chieftain Way

(near the baseball field and the circus tent) pulled up beside him, a black male got out

with a black revolver, ordered him back to his car in the parking lot, made him get into

the trunk, took his cash and car keys, and then left in a vehicle.  Rasku was able to get

out of the vehicle.

Shortly thereafter, FSU police officers Newberry and Gavette saw a black SUV

straddling the middle of the road on Chieftain Way and planned to make a traffic stop.

Rasku, however, ran up to them, pointed out the black SUV, and told the officers that he

had just been robbed by two black males driving a black SUV, and that the black SUV

was heading south on Chieftain Way.  Newberry put out a "be on the look out" for the

black SUV (which apparently drove away while Rasku made his report).

FSU police officer Woodall saw a black SUV on Stadium Drive heading towards

Lake Bradford Road, and he saw the driver, a black male wearing a white T-shirt.  He

made a radio report and turned to catch the black SUV.  FSU officer Zenner was then

behind the black SUV on Lake Bradford Road and tried to make a traffic stop.  The

black SUV took off at a high rate of speed, and was chased south on Lake Bradford,

west on Orange Avenue, south on Capital Circle, and south on Springhill Road (by the

airport).  The SUV stopped at the fence surrounding the city sewer plant at the airport,

and the driver and passenger tried to flee  They hid on sewer treatment property but

were found by police dogs on top of an electrical maintenance building.  Petitioner and

Javier Brown were arrested.

**Section 2254 Standard of Review**

The court may grant federal habeas corpus relief to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A state prisoner must first present all federal claims in state court.  § 2254(b); O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). He "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." 526 U.S. at 845, 119 S.Ct. at 1732.

For a claim which has been properly exhausted and adjudicated on the merits in state court, review is limited.  The state court's determination of a factual issue is presumed correct, unless the petitioner can rebut the presumption by clear and convincing evidence.  § 2254(e)(1).  If the petitioner failed to develop the factual basis for a claim in state court, an evidentiary hearing in § 2254 proceedings is limited by § 2254(e)(2).  *See also* Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that review under § 2254(d)(1), addressed ahead, "is limited to the record that was before the state court that adjudicated the claim on the merits," so the federal court may not rely on new evidence developed in the § 2254 proceedings).[2]

Further, the petitioner must show that the state court's adjudication of the claim:

---

[2] Cullen did not address whether a district court could choose to hold a hearing under § 2254(e)(2) to determine whether § 2254(d)(2) was satisfied.  131 S.Ct. at 1401, n. 8 and 1411, n. 20.

   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).

> Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.  Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court.  28 U.S.C. § 2254(b). If the state court rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions to the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), applies.[3]  And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in § § 2254(d)(1) and (2) applies.  Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding, *see id.*, at 90, 97 S.Ct. 2497.

Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011).  If the

state court issues an opinion, it need not cite or even be aware of controlling Supreme

Court cases under § 2254(d).  *Id.*, 131 S.Ct. at 784 (citation omitted).  Further,

> [w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim" not a component of one, has been adjudicated.

*Id.*

---

[3] To excuse a procedural default, as noted in Wainwright and the cases cited *supra*, a petitioner must demonstrate either cause and prejudice or actual, factual innocence.

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

Harrington, 131 S.Ct. at 788 (quoting Strickland); Premo v. Moore,  131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011) (quoting Harrington).[4]

Even if deficient performance is demonstrated, a petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068. It is not enough to show counsel's errors had a conceivable effect on the outcome, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  466 U.S. at 687, 131 S.Ct. at 2064; Harrington, 131 S.Ct. at 787-788

---

[4] Harrington and Premo were decided by the Court on the same day.

(quoting this language).  "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently," but whether a different result is "reasonably likely."  131 S.Ct. at 791-792 (citing Strickland, other citation omitted). This is not a "more likely than not" standard, but "[t]he likelihood of a different result must be substantial, not just conceivable."   *Id.*, at 793, 104 S.Ct. 2052." (citations omitted).

While Strickland explained the performance and prejudice prongs of analysis, the court need not address them in that order or even address both, as failure to demonstrate either step of Strickland is dispositive of the claim against the petitioner. 466 U.S. at 697, 104 S.Ct. at 2069.

"Surmounting *Strickland*'s high bar is never an easy task," as an ineffectiveness claim functions as a way to present claims not properly presented earlier.  Harrington, 131 S.Ct. at 788 (citation omitted).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  *The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Harrington, 131 S.Ct. at 788 (citations omitted, emphasis added).  *See also* Premo v. Moore,  131 S.Ct. at 739 -740 (quoting Harrington).

## Legal analysis

### Ground one

Petitioner was tried by himself.  Petitioner contends that his attorney was ineffective because he failed to move for severance of his trial on counts I and II, which involved the first robbery of Daniel Lawrence in the apartment complex parking lot.  Doc. 6, p. 4 on ECF (hereafter citations to documents on the electronic docket will be to the page number assigned, not to the page number on the original paper document).  Ex. C (trial transcript).

The trial court cited Strickland and denied this claim.  The court reasoned that it would not have granted a severance because the two sets of offenses were based upon two or more connected acts or transactions and were properly joined for trial pursuant to FLA. R. CIV. P.  3.150(a).[5]  Ex. N, R. 44.  The court also found that prejudice to the outcome could not be shown because Petitioner was acquitted of counts I and II.  *Id.*

Petitioner has not shown that a severance was required under state law.  He has only stated the conclusion.  The trial court's ruling as to this state law question, that a motion for severance would have been denied, is presumed correct.[6]  The evidence

---

[5] That Rule provides in part:

(a) Joinder of Offenses.  Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on 2 or more connected acts or transactions.

[6] "It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.' "  Herring v. Secretary, Dept. of Corrections, 397 F.3d 1338, 1355 (11th Cir.), *cert. denied*, 546 U.S. 948 (2005), *quoting*, Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir.1997) (citations

indicated that Petitioner and Brown committed the two robberies using the same black SUV and the same black revolver in the same geographical area over a very short period of time,[7] and this fit the wording of Rule 3.150(a).

Severance may be proper under Rule 3.152(a)(2) "to promote a fair determination of the defendant's guilt or innocence of each offense."  <u>Williams v. State</u>, 40 So. 3d 89 (Fla. 4th DCA 2010), *review denied*, 60 So. 3d 388 (Fla. 2011).  But prejudice has not been demonstrated.  The jury *acquitted* Petitioner of crimes against Daniel Lawrence.  That the jury was able to distinguish between the two offenses severely undermines any argument that there could have been prejudice to the outcome.  Thus, Petitioner has not shown that the state court's ruling as to this claim of ineffective assistance of counsel has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

**Ground two**

The second allegation of ineffectiveness is that trial counsel failed to seek a jury instruction that Petitioner could not be criminally liable for the "independent acts" of Brown.  Doc. 6, p. 6.  The Rule 3.850 court rejected this argument, finding that the independent acts defense was incompatible with Petitioner's testimony, that he was forced at gunpoint to drive Brown.  Ex. N, R. 44-45.  The court reasoned that Petitioner's

omitted).

[7] The second robbery occurred one half hour after the first robbery.  R. 304.

attorney sought and obtained a jury instruction on duress.[8]  *Id.*, R. 45.  The independent

act instruction, said the court, "is reserved for cases in which a co-defendant or a co-

conspirator engages in unforeseeable behavior not contemplated by the criminal outfit .

. . ," citing <u>Charles v. State</u>, 945 So. 2d 579 (Fla. 4th DCA 2006) and <u>Thomas v. State</u>,

787 So. 2d 27 (Fla. 2d DCA 2001).  *Id.*  The court concluded that a defense of duress

was incompatible with a defense of an unforeseeable independent act.  *Id.*

Florida's Standard Jury Instructions for Criminal cases provides that a person

should be acquitted if the crime was the independent act of another.

> An independent act occurs when a person other than the defendant
> commits or attempts to commit a crime
>
> 1.   which the defendant did not intend to occur, and
>
> 2.   in which the defendant did not participate, and
>
> 3.   which was outside of and not a reasonably foreseeable
>      consequence of the common design or unlawful act contemplated
>      by the defendant.

Instruction 3.6(I), of the Florida Standard Jury Instructions, Criminal.

The duress instruction, however, was given by the trial court only as to count VI,

the fleeing and eluding charge.  R. 534.  The duress and independent act defenses

were not necessarily incompatible.  The defense of duress was raised as a defense to

the fleeing and eluding charge.   According to Petitioner's testimony, *infra*, his fled at a

---

[8] A duress or coercion instruction is proper if there is evidence that the defendant was "under the compulsion or coercion of a real, imminent and impending danger or what he had reasonable grounds to believe was a real, imminent and impending danger," the coercion was continuous, and the defendant had "no reasonable opportunity to escape the compulsion without committing the crime."  <u>Aljak v. State</u>, 681 So .2d 896, 897 (Fla. 4th DCA 1996).

high rate of speed from pursuing police cars because Brown pointed a gun at him.  But
Petitioner said that this was the first time that he even saw the gun.

Petitioner testified at the trial that he was 20 years old and had never been
convicted of a crime.  R. 351.  Petitioner said that he called Javair Brown earlier on the
morning of August 17, 2003, and asked Brown to come over to get some clothes that
Petitioner was giving away.  R. 352.  At 11:00 a.m., Brown said he had his roommate's
car and he was on his way over.  *Id*.  Both sat down and watched television after Brown
arrived and parked.  R. 353.  The bag of clothes that Petitioner gave Brown contained a
red jumpsuit.  *Id*.  Brown then left, but called back and asked Petitioner to look for a bag
of marijuana he had left at Petitioner's house.  R. 354.  Petitioner said he would, and he
put the bag in his burgundy cap and used his roommate's car to drive to Brown's house.
R. 355.  Petitioner was driving his roommate's 2003 Toyota Camry.  *Id*.  He arrived at
Brown's house at about 11:15 p.m. that night, and gave Brown the burgundy cap with
the marijuana in it.  R. 355-356.  Petitioner then gave Brown the keys so that Brown
could go to the gas station and put gas into the car.  R. 357.  Brown returned.  *Id*.
Brown and Petitioner later exited Brown's residence and the Camry was being towed
away because Brown had parked it in residence parking at the apartments.  R. 371-372.
They then got into "his roommate's car" (apparently another car) and dropped Petitioner
off at Petitioner's house.  R. 372.  Petitioner said that Brown left, and when he came
back 20 minutes later, at about 2:45 a.m., Brown was driving the black 1992 Ford
Explorer SUV.  R. 372-373.  Petitioner said he had nothing at all to do with the earlier
robbery of David Lawrence.  R. 381.

Petitioner said they then drove to find an ATM so that Brown could get money to pay the tow truck driver.  R. 373.  They saw the tow truck at a BP station, and pulled in front of it.  R. 374.  It is noted that, according to Petitioner, at least 20 minutes had elapsed from the time the tow truck left the parking lot with the Camry to the time that Petitioner and Brown found the tow truck at the BP station.  Brown parked at the station and Brown went inside; Petitioner talked to the tow truck driver, told the driver that Brown would pay (but did not), and then moved the SUV and the tow truck driver departed towing the Camry.  R. 374-375.  Brown asked Petitioner to drive to "the guy's house" where he said he left his pants with his wallet in it.  R. 375.

Petitioner said it was never his intent to commit a robbery.  *Id.*  Petitioner said he was new to Tallahassee, did not know his way around, and Brown directed him to "over there by the Stadium."  R. 378.  Brown told Petitioner that he missed the entrance to the parking lot, Petitioner began to turn around, Brown hopped out, Petitioner executed the turn around (which he said took three minutes), and drove back to the entrance to the parking lot where he saw Brown's feet "hanging out of a vehicle about two cars down from the entrance of the parking lot."  R. 378-379.  Petitioner parked the SUV close to the car, but did not think it was "weird" until Brown "hopped out of that vehicle and left the car door open and ran back to the vehicle that I was in."  R. 379-380.  Petitioner again said that he did not know that Brown was going to commit a robbery, "not even at the time that he came back to the car."  R. 380-381.  Petitioner said that when Brown "came back to the car and hopped in, I mean, he was like pumped up.  He was like, man, ride, ride."  R. 381.

Petitioner drove past a police car, Brown ducked down in the seat, and the police car pulled behind the SUV.  R. 382.  Petitioner said he then realized he was driving on a suspended license and would go to jail if he were to be pulled over.  R. 382-383. Petitioner took a right turn, another police car appeared and turned on its lights, and Petitioner told Brown that he needed to call his roommate to let him know he was "fixing to go to jail for driving with a suspended license."  *Id*.  Petitioner said that Brown pointed a gun at him, and told him to "drive off."  R. 384.  Petitioner said that this was the first time he had seen the gun.  *Id*.  Petitioner concluded that he was scared, "[a]nd we ran and we got caught."  R. 385.  He said that when he left the SUV and ran, he still had no knowledge of the robberies.  R. 387.  Petitioner said he told the officers that Brown was driving due to his (Petitioner's) suspended license.  R. 391.  He said that the only reason he fled from the police was because Brown held a gun on him.  R. 396.

On cross examination, Petitioner said he had no knowledge of why Brown dropped him off for 15 minutes.  R. 405.  He persisted that it took him three minutes to turn the SUV around after Brown had left the SUV; he said he let another car pass, and drove back to where Brown was, with his legs sticking out of the car in the parking lot. R. 412-413.  He said he saw how Brown reacted to the presence of the police, and he really did not want to get involved, and asked Brown for the quickest route back to Petitioner's house.  R. 417.  He said that as they fled at up to 100 miles per hour, Brown stopped pointing the gun at him and told him to tell the police that Brown was driving. R. 419-421.

In summary, the Rule 3.850 court erroneously found that the duress defense was incompatible with (and therefore precluded) the independent act defense as to all counts.  It was not.  The independent act instruction could have been limited to the two robberies, which would not have been incompatible with an instruction as to duress for the fleeing and eluding charge.  Petitioner's testimony justified both instructions.

But attorney error or prejudice to the to outcome for counsel's failure to seek such an instruction has not been shown because Petitioner's attorney fully argued the law governing culpability as a principal and the court gave the standard principals instruction.  In final argument, Petitioner's attorney argued that Petitioner was not present at all during the robbery of David Lawrence, "he was not linked by evidence to that robbery at all."  R. 465.  He argued that, assuming that the State had shown that Brown committed both robberies, the issue was whether the State had proven that Petitioner "aided and abetted Brown in committing the robberies."  R. 469.  He explained that "that's called a principal theory. . . .  You could be somebody else who is driving the car."  R. 470.  He argued that the State had not proven beyond a reasonable doubt that Petitioner drove the SUV during the robbery of Lawrence.  R. 470-471.  With respect to the robbery of Rasku, counsel for Petitioner argued,

> what you have got, again, is Mr. Kellom as the driver, the driver of the
> vehicle, who has testified he did not know when Brown got out of the car
> and went away that he at that point was going to do a robbery.  So under
> the principal's theory, did he encourage him?  Did he aid him?  Did he help
> him?  There is simply a lack of evidence in light of Mr. Kellom's testimony
> that he did those things.

R. 472.

The court gave an instruction on principals.  The court instructed that if a defendant

> helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did, if, one, the defendant had a conscious intent that the criminal act be done; and, two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or person to actually commit or attempt to commit the crime.

R. 534.

Petitioner was acquitted of the offenses involving Lawrence, so the jury must have had a reasonable doubt as to whether he was the driver of the SUV in that robbery.  This court's focus, therefore, is upon the crimes involving Rasku.

Petitioner could have been found guilty had the jury believed that he was the one who pointed the firearm at Rasku and robbed him.  Had they believed that, the independent act defense would have been moot.

The independent act instruction was needed only for the possibility that Petitioner was culpable as one who aided and abetted Brown in the robbery of Rasku.  It would have been a defense if the jury believed that Petitioner did not know that Brown planned to rob Rasku when he got out of the vehicle.

The independent act defense for crimes against Rasku was fully covered by the principals instruction.  If the act by Brown against Rasku was not foreseen and Petitioner did not intend the robbery to occur, as required by the independent act instruction, then Petitioner cannot have had a "conscious intent that the criminal act be done," as required by the principals instruction.  There was no need for an independent

act instruction.   Review under <u>Strickland</u> is "highly deferential," and when the two apply

in tandem, review is "doubly" so. Consequently, Petitioner has not shown that the state

court's ruling on this claim, under the highly deferential standard of <u>Strickland</u>, "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).

**Ground three**

Petitioner argues that his trial counsel was ineffective for failing to object to

enhancement of the sentence for count V, the kidnapping count, to a life felony.  While

he does not explain his claim in his § 2254 petition, Petitioner alleged in his second Rule

3.850 motion that kidnapping to commit a felony as charged was only a first degree

felony.  Ex. CC, R. 10.  Petitioner argued that it would become a life felony only if he

had actually possessed a firearm, and he did not.  *Id*.  He argued that it was always the

State's contention that Rasku was robbed and kidnaped at gunpoint by Brown, and that

Petitioner was culpable only as a principal, without actually possessing the firearm.  *Id*.

Kidnapping to commit a felony is a first degree felony punishable by up to life in

prison.  FLA. STAT. § 787.01(1)(a) and (2).  Kidnapping committed while the defendant

"actually possessed a 'firearm'" carries a minimum prison term of 10 years.  FLA. STAT. §

775.087(2)(a)1.h.  A first degree felony during which the defendant "carries, displays,

uses, threatens to use, or attempts to use any weapon or firearm, or during the

commission of such felony the defendant commits an aggravated battery," becomes a

life felony.  FLA. STAT. § 775.087(1).

This claim was denied on the merits by the same circuit judge who presided over the trial and sentencing. Ex. DD, R. 23-24. Circuit Judge Kathleen Dekker ruled that she would not have imposed a different sentence even if counsel had objected. R. 24. She explained that she imposed a 20 year (or 240 months) prison sentence on count V, as well as counts III and IV, to run concurrently, and had decided that, due to the seriousness of the offenses, she would not impose the minimum guideline sentence of 121.6 months. *Id.* She noted that Petitioner participated in the robbery, carjacking, and kidnapping of Rasku, a college freshman, that Rasku was held at gunpoint and locked into the trunk of his car by a masked gunman, and that Petitioner had driven the get-away car at high speed, trying to elude the police. *Id.* Judge Dekker said she considered Petitioner's age in imposing the sentence, but "[a]n even lower 6-year youthful offender sentence for this crime is inconceivable and would never have been entertained." *Id.* She therefore determined that Petitioner's attorney had not been ineffective. *Id.*

Whether considered to be a first degree felony or a life felony, the statutory maximum sentence was life in prison. An objection that count V was not a life felony would not have changed the sentencing outcome as to count V, especially since this was the same 20 year prison sentence as imposed for counts III and IV. Thus, Petitioner has not shown that the state court's ruling as to this claim of ineffective assistance of counsel has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**Ground four**

Petitioner contends that his attorney was not effective because he did not *properly* seek a judgment of acquittal as to count IV, armed carjacking.  The claim was explained further in his second Rule 3.850 motion.  Petitioner argued there that Scott Rasku testified that the person who robbed him had demanded that he give him his dormitory room key, so the robber could go to the room and get Rasku's wallet.  Ex. CC, R. 14.  Petitioner argued that this did not show specific intent to take possession of the motor vehicle, but only to steal the wallet.  *Id.*  He argues that a judgment of acquittal would have been entered had counsel made this specific intent argument.  *Id.*

Rasku testified that the perpetrator[9] told him to get into the "trunk" of Rasku's car, which was a hatchback (a Toyota Celica); so it was not as if he were trapped in a trunk.  Ex. C, R. 69.  Rasku said the perpetrator demanded he give him his wallet.  *Id.*, R. 70.  Rasku told him that his wallet was in his dormitory room.  *Id.*  The perpetrator demanded that Rasku give him his keys and tell him where the room was, and Rasku gave him a false room number.  *Id.*, R. 70-71.  The keys included a key to the dormitory room and to the car.  *Id.*, R. 71.  The perpetrator told Rasku that he was going to the dormitory room to get Rasku's wallet, and that when he returned he would let Rasku out of the "trunk."  *Id.*, R. 72.  The perpetrator then left and Rasku heard a "truck, like

---

[9] Rasku said that the perpetrator had a burgundy mask on, with holes for the eyes and mouth, and was wearing a lot of dark clothes, including red pants.  R. 64-65. The prosecutor told the court that he did not argue that the gunman who robbed Rasku was Petitioner.  R. 309.

peeling out on the gravel rocks." *Id.* Rasku waited a bit, then pushed the backseats down and crawled out of his car. *Id.*, R. 72-73.

In denying this claim, the Rule 3.850 court noted that Petitioner's attorney had moved for judgment of acquittal and had argued that taking the keys, which had the dormitory key and the car key on the ring, was not enough to show control of the motor vehicle sufficient to sustain a conviction for carjacking.[10] Ex. DD, R. 26, citing Ex. C, R. 310.  The court noted that, after a recess, the prosecutor argued that just taking the car key was carjacking, according to a case from the First District Court of Appeal.  Ex. DD, R. 26, citing Ex.C, R. 330.  The court reasoned that "counsel's failure to convince the Court to rule his favor does not amount to ineffective assistance."  *Id.*

In argument on this issue at trial, the prosecutor cited James v. State, 745 So. 2d 1141 (Fla. 1st DCA 1999) and Price v. State, 816 So. 2d 738 (Fla. 3d DCA 2002).  Ex. C, R. 330.  In the James case, the court noted that the defendant "took the car keys from the owner, excluded him from control of the Pontiac, and attempted to start the vehicle," finding that this temporary deprivation of the possession of the vehicle was sufficient for a carjacking conviction.  745 So. 2d at 1142.  Likewise, in Price v. State, the evidence was sufficient to prove carjacking where the defendant took the keys, entered the car, locked the doors, and tried to start it.  816 So. 2d at 741.

The facts here are effectively the same.  Although Brown told Rasku that he wanted the car keys so that he could go to the dormitory room and take the wallet, instead he immediately went to the SUV and he and Petitioner fled with the keys.  This

---

[10] The trial court had raised the issue of the car key *sua sponte.*  Ex. C, R. 307-308.

certainly excluded Rasku from control of his vehicle.  A jury could conclude that Brown took the keys to deprive Rasku of the use of his motor vehicle while he and Petitioner could make their escape.  Petitioner has not come forward with any other Florida decision which his attorney could have argued to achieve a different result, and on the facts and law in this record, it appears there was no viable motion for judgment of acquittal for counsel to make.  Petitioner has failed to satisfy the requirements of   28 U.S.C. § 2254(d)(1) as to ground four.

**Ground five**

Petitioner contends his attorney was ineffective for failing to file a motion for a new trial based upon insufficiency of the evidence.  This was raised as ground three in the first Rule 3.850 motion.  Ex. L, R. 15-16.  The gist of the motion is that he should have been acquitted of complicity in the second offense because he was acquitted of the first offense.  *Id.*  Respondent notes that this claim was summarily denied on the merits without a hearing.  Doc. 15, p. 27.

On belated appeal, Petitioner was not required to file a brief, but chose to do so, and omitted this claim in his brief.  Doc. 15, pp. 27-28.  Respondent acknowledges that the Eleventh Circuit has held that when a brief is not required on appeal from complete summary denial of a Rule 3.850 motion without an evidentiary hearing pursuant to FLA. R. APP. P. 9.141(b)(2)(C)., there is no procedural default for failing to mention some claims that had been litigated in the Rule 3.850 motion. Cortes v. Gladish, 216 Fed.Appx. 897, 899  (11th Cir. 2007).  Respondent makes a plausible argument for the proposition that if a litigant nonetheless files a brief, although not required to do so, he

waives claims not presented in the brief.  Doc. 15, pp. 29-31.  Respondent argues,

therefore, that Petitioner failed to complete one full round of state court remedies and

the claim is procedurally defaulted.

While I appreciate Respondent's desire to protect the record on this point, it is

easier and more efficient for this court to reach the merits to deny the claim.

A motion for a new trial may be granted when the "verdict is contrary to law or the

weight of the evidence."  FLA. R. CRIM. P. 3.600(a)(2).   " 'Weight of the evidence' tests

whether a greater amount of credible evidence supports one side of an issue or the

other."  Geibel v. State, 817 So.2d 1042, 1044 (Fla. 2d DCA 2002).

The Rule 3.850 court (Judge Dekker) denied this claim of ineffectiveness, finding

that a mixed verdict is evidence that the jury was conscientious.  Ex. N, R. 45.  The

court also determined that joinder of offenses does not require that the verdict be the

same on all offenses joined.  *Id.*  The court reasoned that the jury did not believe

Petitioner's testimony, as it was permitted to do, and a motion for a new trial would have

been fruitless.  *Id.*, R. 45-46.  Judge Dekker presided over the trial, and this ruling

plainly shows that she would not have found the verdict on the counts involving the

robbery of Rasku to have been contrary to the weight of the evidence.  Thus, Petitioner

has not shown that the court's rejection of his ineffectiveness claim was error as defined

by § 2254(d)(1).

**Ground six**

Petitioner contends that his attorney was ineffective for failing to properly renew

the motion for judgment of acquittal after his testimony, to argue that the State's

evidence failed to contradict his theory of innocence.  The Rule 3.850 court denied this claim, finding: "Defendant believes that by testifying that he did not know his co-defendant was going to commit any crimes, Defendant completely exonerated himself and was entitled to a JOA on all of the charges."  Ex. DD, R. 27.  The court noted that it denied the motion for judgment of acquittal that was argued at the close of evidence, believing that "there was enough prima facie evidence to allow the jury to 'sort out what they believe' and to decide what the Defendant knew."  *Id.*  Judge Dekker concluded: "The Judge heard and considered all of the evidence and testimony presented to the jury during the trial, and further argument from counsel would not have resulted in a JOA."  *Id.*, R. 27-28.

This ruling is so obviously correct, there is no need for elaboration.  Defendant's presence in the get-away vehicle was clearly established, and Rasku's testimony gave rise to a reasonable inference that the driver of that vehicle was positioning the vehicle to help Brown accomplish the robbery.  A jury may believe some or all of the accused's testimony.[11]  Petitioner was not entitled to judgment of acquittal based upon his testimony standing alone.  Ground six affords no relief.

**Ground seven**

---

[11] Further, in the insufficiency of evidence context, "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt."  United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004) (citation omitted).

Petitioner contends his attorney was ineffective because he did not object to allegedly impermissible statements by the prosecutor in closing argument.  Petitioner sets forth the specifics of this claim in document 17, pp. 16-33.

The purpose of closing argument under Florida law is to review the evidence:

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.  Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985); Dessaure v. State, 891 So. 2d 455, 468 (Fla. 2004).  "Merely arguing a conclusion that can be drawn from the evidence is permissible fair comment."  Mann v. State, 603 So. 2d 1141, 1143 (Fla. 1992).

The Rule 3.850 court denied this claim, first finding that most of the alleged improprieties were not improper.  Ex. DD, R. 24-25.  The court found that "the State did not impermissibly refer to matters that were not in evidence."  *Id.*, R. 24.  The court specifically found that the reference to Officers Newberry and Gavette as "two men who have no reason to lie, have no dog in this fight," did not suggest that their status as officers made their testimony more credible, and did not improperly vouch for their credibility.  *Id.*, R. 25.  The court determined that the prosecutor did not improperly vouch for the credibility of Rasku.  *Id.*  Finally, the court said that even had counsel objected, she would not have granted a mistrial and therefore prejudice to the outcome had not been shown.  *Id.*  She said that the case turned upon Petitioner's intent, not whether he was present at the scene of the robbery of Rasku.  *Id.*

The prosecutor structured his closing around what he termed 22 "glaring inconsistencies."  Ex. C, R. 483.  The first, and the first part of Petitioner's claim (doc. 17, p. 19), was argument about Petitioner's testimony:  that he saw the tow truck taking the car out of the apartment parking lot, Brown then takes Petitioner home, Brown comes back 15 minutes later (when the first robbery supposedly happened), they drive to a BP station, and there they both see the tow truck with the car in tow.  *Id.*, R. 483-484.  The prosecutor argued that it did not happen that way.  He argued that Petitioner's version was "impossible," that had 15 minutes elapsed, "that tow truck would have already dropped off the car."  *Id.*, R. 484.  He argued that what must have happened instead is that Petitioner and Brown immediately followed the tow truck to the BP station, with no intervening 15 minutes for Brown to run off and commit the first robbery. *Id.*  While it is possible that the tow truck had stopped at the gas station, it was also reasonably unlikely to find it there after 15 minutes (and actually more, if Petitioner's testimony as to timing were to be believed).  This was fair comment on the evidence, not "unsworn testimony" by the prosecutor.

The next fault argued by Petitioner is the fourth alleged inconsistency, when the prosecutor drew the jury's attention to Petitioner's assertion that it took three minutes to turn the SUV around after Brown got out at the parking lot.  Ex. C, R. 485.  The prosecutor argued that Petitioner claimed that this was "because of this horrible power steering problem."  *Id.*  Petitioner argues that he did not so testify.  Doc. 17, p. 21. Petitioner is mistaken.  He testified on direct that Brown told him that he had missed the entrance of the parking lot.  Ex. C, R. 378.  He then said:

> And at that time I stopped the vehicle and told him I was fixing to make a u-turn and go back to the entrance. *But being that the car had bad power steering*, and there was an approaching vehicle, I didn't want to make the u-turn in the middle of the street and prevent the vehicle from passing by because I knew it was going to probably take me a minute to make that maneuver.

*Id.*, R. 378 (emphasis added).  He then said that "it took a total of about three minutes for the vehicle to pass by and me to make a u-turn and go back towards the entrance of the parking lot."  *Id.*, R. 379.  The prosecutor's comment was fair comment on the evidence.

The next issue raised by Petitioner is inconsistency seven, that the prosecutor said that Rasku said that "the *defendant* got out, the gunman, got out of the passenger's side."  Doc. 17, p. 22, citing Ex. C, R. 486 (emphasis added).  This was a minor slip, and was immediately corrected to "the gunman."  Further, the prosecutor made it clear to the jury that it was the State's theory of the evidence that Brown was "the gunman," and that Petitioner "sat outside watching" from the SUV.  *Id.*, R. 499-500.  This was fair comment on the evidence.

The next claim involves closing argument that the jury should reject the duress defense because Petitioner ran with Brown when they fled the SUV.  Doc. 17, p. 23, citing Ex. C, R. 490.  There, the prosecutor argued that if Petitioner were truly innocent because of duress (fear of Brown), then why did Petitioner run and do "everything in his power to be with" Brown after the SUV came to a stop.  Ex. C, R. 490.  This ties in with a question that the prosecutor had earlier asked Petitioner on cross examination.  The prosecutor established that less than a minute before the SUV stopped, Petitioner thought that Brown was going to kill him with the handgun.  *Id.*, R. 421-422.  Petitioner

next said that he did not see Brown throw the handgun out of the window, implying that Brown still was armed when the SUV stopped.  *Id.*, R. 422.  The prosecutor then asked: "But instead of running to the police [who were chasing Petitioner and Brown], who would  assumedly not shoot you, you run into the night with him?"  *Id.*   Petitioner answered:  "Correct."  *Id.*  While it could also be argued that Brown no longer threatened Petitioner with the handgun when they started running, the prosecutor's argument was fair comment on the evidence.

The next claim focuses upon the prosecutor's argument that it was inconsistent for Petitioner to not know anything about the red suit when Petitioner's keys were "wrapped in" the red suit.  This was the twentieth inconsistency argued.  Doc. 17, p. 24, citing Ex. C, R. 494.  Petitioner's complaint is that the evidence did not show that Petitioner's keys were "wrapped in" the red suit, but were only next to the red suit on the roof  *Id.*

Petitioner testified that Brown took off the red pants (or jumpsuit) in the SUV while they were fleeing from the police.  Ex. C, R. 423, 426-427.  Later, Petitioner said that Brown took off the red jumpsuit before they ran from the police (though after robbing Rasku).  *Id.*, R. 428.  When the SUV came to a rolling stop, Petitioner said that Brown jumped out of the car with clothing in his hands, but Petitioner did not then know whether Brown still had a handgun in his hand.  *Id.*, R. 430.  Petitioner said he was no longer worried about the gun because Brown had reassured him that Brown would tell the police that Petitioner was driving, saving Petitioner from a charge of driving on a suspended license.  *Id.*, R. 431.  Petitioner said that after they climbed on top of the roof

of a building to try to hide,[12] Brown laid the clothing and his cellphone on the roof, and

Petitioner said he had his roommate's keys in his own pocket and he left the keys up on

the roof.  *Id.*, R. 432.  A police officer testified that he found a pile of clothing on the roof,

which included a cellphone and a red jumpsuit with a burgundy "toboggan" inside one of

the pockets of the red jumpsuit.  *Id.*, R. 155.  The officer said he also found a set of keys

but did not say where, other than imply that they were on the roof.  *Id.*, R. 159.  The

prosecutor asked whether the *mask* (toboggan) was "wrapped up" in the red jumpsuit,

and the officer said yes.  *Id.*, R. 161.

In summary, it would appear that prosecutor misspoke but little harm was done.

He mixed up the location of the mask, which was "wrapped in" the red jumpsuit, with the

location of Petitioner's keys.  The confusion was of little importance, and the argument

was not particularly damaging.  Petitioner had admitted that Brown took off the red

jumpsuit and carried it onto the roof.  This was not a situation where Petitioner said he

knew nothing about the red jumpsuit.  Further, it seems obvious that the items found on

the roof were just dumped there in a pile.  Whether Petitioner took his keys out of his

pocket and either he or Brown wrapped them up in the red jumpsuit, or whether

Petitioner placed the keys next to the red jumpsuit, was of little importance..  Attorney

error for failing to object has not been shown as to this issue.

The next alleged misstatement of the evidence is that the prosecutor said that

the gun was found on the roof.  Doc. 17, pp. 25-26, citing Ex. C, R. 495.  The prosecutor

---

[12] The police found Petitioner and Brown, on top of a roof of a centrally located
building, at the gated sewer plant.  Ex. C, pp. 138, 154.

argued: "We find a gun on the roof.  It is a black revolver."  *Id*.  The revolver was not found on the roof, but was found beside the road on the route that Petitioner took when fleeing in the SUV.  Ex. C, R. 255, 285-286.  This was not a fair comment upon the evidence, and Petitioner's attorney might have objected, but I can readily see why Petitioner's attorney did not object.[13]  Petitioner's defense to fleeing and eluding was that Brown threatened him with a firearm.  Petitioner had testified that even as he exited the SUV, he did not know whether Brown still had the revolver, and he did not see Brown throw it out of the SUV as they fled.  Petitioner's defense of duress was all the more viable if the jury thought that Brown still had the revolver on top of the roof.  Attorney error has not been shown.

Petitioner claims that the prosecutor improperly suggested to the jury that he could be convicted as to the first robbery either as the one who confronted Lawrence with the revolver or the one who drove the get-away car.  This was proper argument, seeking conviction in the alternative, and even if it was not, Petitioner was acquitted of counts related to the first robbery.

The next complaint is that he prosecutor improperly vouched for the credibility of Officers Newberry and Gavette.  The prosecutor argued that Officer Gavette had said that at about the time of the robbery of Rasku, Gavette drove past the black SUV in which Petitioner and Brown were riding on the two lane road.  Ex. C, p. 488.  He said

---

[13] Indeed, a "dilemma" of defense counsel, as to improper remarks by the prosecutor in closing, is that "[o]bjections may also serve to draw unwanted and unnecessary attention" to the improper comments.  <u>United States v. Wilson</u>, 149 F.3d 1298, 1301, n. 5 (11th Cir. 1998) (collecting cases).

that he could see the driver in a white shirt, with gold teeth, and that they were close, driver's side to driver's side.  *Id.*  The prosecutor then referred to Petitioner's testimony, that when Gavette passed, Petitioner was parked in a parking lot on the right side and that Gavette, "if he saw him at all, must have seen him through the passenger side."  *Id.* The prosecutor said that this was a direct conflict, and: "Again, two men who have no reason to lie, have no dog in this fight."  *Id.*

Improper vouching only occurs when the State "places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony."  Hutchinson v. State, 882 So. 2d 943, 953 (Fla. 2004).  A prosecutor, however, may "argue any reasons, if supported by the evidence, why a given witness might or might not be biased in a case, but the prosecutor may not properly argue that a police officer must be believed simply because he is a police officer."  Johnson v. State, 858 So. 2d 1274, 1276 (Fla. 3d DCA 2003) (quoting Williams v. State, 747 So. 2d 474, 475 (Fla. 5th DCA 1999)).  "Comments by the prosecutor asking the jurors to evaluate what motive a police officer would have to deceive them is not improper when made in connection with evaluating a witness' credibility."  Smith v. State, 818 So. 2d 707, 709 (Fla. 5th DCA 2002) (citing Johnson v. State, 801 So. 2d 141 (Fla. 4th DCA 2001) and Reyes v. State, 700 So. 2d 458 (Fla. 4th DCA 1997)). Accordingly, the prosecutor here did not vouch for the credibility of Officers Newberry and Gavette since he only asked them to consider what motive the officers might have to lie.

The same is true about the next issue, where the prosecutor argued that Scott Rasku had "no reason to lie."  Doc. 17, p. 30, citing Ex. C, R. 487.[14]  The portion quoted by Petitioner is the same as the argument about the credibility of the officers.  It is proper for the prosecutor to ask the jury to consider whether a witness had any motive to lie.

The final claim of improper final argument in ground seven is that the prosecutor argued that Petitioner lied when he testified.  Doc. 17, pp. 31-32.  It is well-established that the prosecutor may argue that a witness "lied" if that characterization is based upon trial evidence.  State v. Comesana, 904 So. 2d 462, 463-464 (Fla. 3d DCA 2005).

In summary, ground seven affords no relief.  Petitioner has not shown that the trial court's rejection of this ineffectiveness claim has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

**Certificate of Appealability**

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2254 Rule 11(b).

---

[14] Page 487 of the transcript is missing from the court's record, but it does not appear necessary to correct this problem.  It is assumed that Petitioner had access to it as he quoted the testimony in his reply and it is assumed that his reference is accurate. Doc. 17, p. 30.

I find no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied.  See Fed.R.App.P. 24(a)(3)(A) (before or after a notice of appeal is filed, the court may certify the appeal is not in good faith or the party is not otherwise entitled to appeal in forma pauperis).

**Conclusion**

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by Jason B. Kellom pursuant to 28 U.S.C. § 2254, challenging his convictions after a jury trial for armed carjacking (count III), armed carjacking with a firearm (count IV), kidnapping to facilitate a felony (count V), and felony fleeing and eluding (count VI), case number 2003-CF-3248, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, be **DENIED WITH PREJUDICE**, that a certificate of

appealability be **DENIED** pursuant to § 2254 Rule 11(a), and that leave to appeal in

forma pauperis be **DENIED**. .

IN **CHAMBERS** at Tallahassee, Florida, on March 23, 2012.


s/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**